Philip W. Jungert and Henrietta Jungert v. Commissioner.
Jungert v. Commissioner
Docket No. 4617-66.
United States Tax Court
T.C. Memo 1968-116; 1968 Tax Ct. Memo LEXIS 181; 27 T.C.M. (CCH) 555; T.C.M. (RIA) 68116; June 17, 1968, Filed Francis J. Butler and Lynne M. Seelye, for the petitioners. Gary C.Randall, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined a deficiency in the Federal income tax of petitioners for the calendar year 1962 in the amount of $6,893.35. This sole issue for determination is whether petitioners are entitled to deduct the amount of $19,000 as a theft loss, pursuant to section 165 of the Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Philip W. Jungert (hereinafter referred *182 to as Phil) and Henrietta Jungert, are husband and wife with their legal residence in Lewiston, Idaho, at the time the petition herein was filed. For the calendar year 1962 they reported income on the cash basis. They filed a Federal joint income tax return for the year 1962 with the district director of internal revenue at Boise, Idaho. Prior to the year 1962 Phil had been engaged in real estate investment and in various timber operations, including the operation of a small stud mill and the buying and selling of timber. In buying timber properties Phil and his brother Marion Jungert (hereinafter referred to as Marion), utilized the following "modus operandi": they would make a cursory examination of the property themselves; they would then compute a price based upon this examination, said price usually being relatively low; and in order to make the offer more attractive a relatively large cash payment would be offered. In 1959 Phil and Marion became engaged in a mining and dredging operation and discontinued the timber business. In 1962 they ceased the mining and dredging operation. Also in this year Phil and Marion, each acting in their individual capacity, handled the sale *183 of certain shares of stock in an Idaho corporation. By the end of August 1962 they received commissions totaling $35,316.88 in connection with such sales. 556 After the closing of the mining and dredging operation they began to look for an investment opportunity in timberland. On December 5, 1962, Marion stopped for gasoline in Riverside, Idaho, at the Payless Gas Station. Riverside is a small community located approximately one mile west of Orofino, Idaho, and 60 miles east of Lewiston, Idaho. While at the station Marion inquired of its then owner, Frank Davis (hereinafter referred to as Davis), whether he knew of any real estate in the area for sale. Davis, who was a longtime acquaintance of Marion, stated that he was not familiar with the real estate market in the area. On December 7, 1962, Marion contacted a broker in Orofino. The broker suggested the Dickson ranch, which was composed of pasture and timberland. The ranch was also used for cattle raising. The asking price for the ranch was $85,000, exclusive of cattle and timber. The broker took Marion to view the ranch that afternoon. At that time arrangements were made for Marion and Phil to meet with Loyal Dickson (hereinafter *184 referred to as Dickson), the owner of the ranch, the following morning. On December 8, 1962, Marion and Phil arrived at the ranch and along with Dickson inspected the property. No specific offer was made at that time. On the way to the ranch, Marion and Phil stopped at the Payless gas station and indicated that they were going to look at a ranch. At that time Marion asked Davis if he were interested in leasing a wrecker which Marion had. Davis stated a possible arrangement might be made on a percentage basis. Marion and Phil then departed and inspected the ranch. After discussing the matter Marion and Phil decided to make an offer to purchase the ranch, cattle and timber for a total price of $60,000. It was their intention to sell the cattle and timber and to sell the land in parcels. They did not intend to operate the property. They further decided that in order to make their offer, which was concededly low, more attractive they would offer Dickson a large cash downpayment of $36,000. On the morning of December 10, 1962, Phil and Marion met at their office in Lewiston. Their secretary counted out $36,000 in $100 bills and tied it in 12 bundles of $3,000 each. The money was *185 placed in a manila envelope. Marion left the office with the money with the expressed intention of making a cash offer to Dickson at his ranch later that evening. At approximately 3:00 p.m. that afternoon Phil telephoned the real estate broker and informed him that an offer would be made to Dickson. Although the broker was not asked to accompany Marion to the ranch, he was available to draw up any needed contracts. He was, in addition, assured that his commission would be paid if the sale was completed. At approximately 5:00 p.m. Marion left Lewiston with the $36,000 in cash. He was driving Phil's 1959 two-door Buick automobile, and the envelope containing the money was beside him on the front seat. At approximately 7:00 p.m. Marion stopped at the Payless gas station. He parked on the east side of the station and locked the right-hand door of the automobile. He attempted to lock, and was of the opinion that he had locked, the left-hand door of the automobile. Due to a faulty locking mechanism, however, it is uncertain whether this was accomplished. When he walked away from the automobile, the envelope containing the cash was still on the front seat. It was Marion's intention, *186 while in the Orofino area, to inquire of Davis if he had further considered the possible leasing of the wrecker. Marion entered the station and asked the attendant on duty if Davis was there. Upon being informed that Davis was at home, Marion placed a telephone call to Davis. Davis arrived at the station about 7:15 p.m., parking his car on the west side of the station. They discussed the possible leasing of the wrecker and Davis informed Marion that he was no longer interested. While Marion was at the station, the automobile was either wholly or partially in view from inside the station and from the gas pump area. Though darkness had fallen, the station area was generally well lighted. The only people that were seen in the area during this time were some children. After their discussion, which lasted approximately 10 to 15 minutes, concerning the wrecker, Marion and Davis left the station and went to their respective automobiles. Marion opened the left-hand door of the automobile, which was unlocked, and discovered that the envelope containing the money was gone. Marion returned to the front of the station. Davis, who had 557 noticed Marion peering into the car, and then seeing *187 Marion returning to the station, got out of his own car and returned to the front of the station. Marion was visibly upset and requested the use of Davis' telephone, stating that he had lost a package containing $36,000 in cash. Marion immediately telephoned the sheriff's office and reported the loss. The sheriff and a deputy responded to the call. A search of the area failed to reveal the money. In addition, some of the children observed in the area were questioned, but to no avail. On January 7, 1963, Marion swore out a "John Doe" warrant charging that persons unknown had, on December 10, 1962, "willfully, unlawfully, intentionally and feloniously committed the crime of grand larceny." No one has been arrested in connection with the reported disappearance of the money and to date the money has not been reported recovered. Neither has the loss been compensated for by insurance or otherwise. Of the total of $36,000 lost, $19,000 belonged to Phil. On their joint income tax return for the calendar year 1962, the petitioners deducted the amount of $19,000 as a theft loss. Respondent in his statutory notice of deficiency disallowed the deduction stating that petitioners had failed *188 to prove the loss. Opinion The sole issue for determination is whether petitioners are entitled to deduct the amount of $19,000 as a theft loss pursuant to section 165. [2] The burden of proof is upon the petitioners. The respondent makes a dual attack upon petitioners' claim for the deduction. First, he argues that their testimony is not worthy of belief. Second, he argues that, even if we should accept petitioners' evidence as true in its entirety, such evidence is still not sufficient to sustain their burden of proof. We have heard all the evidence in the trial of this *189 matter, and we are satisfied as to its credibility. Respondent suggests on brief that the testimony of Phil and Marion is incredible and patently false. We do not agree. The record in this case reveals that the Jungert brothers had in the past transacted business in the same manner as that which they adopted in the present case. They would make a cursory examination of the property and make an offer solely on this basis. Though their offer was usually low, as merited by the lack of a detailed investigation, they would attempt to make it more attractive by offering a large cash downpayment. This testimony as to their method of doing business was corroborated by their secretary who also testified that it was not unusual for them to have relatively large amounts of cash on their persons in connection with business transactions. We are not inclined to substitute our own judgment as to what is a proper method of doing business for that adopted by Phil and Marion. This Court is well aware of the fact that different people conduct business in different ways. The mere fact that there might exist a more logical and cautious method than that used herein does not render their method any the *190 less worthy of belief, particularly when the record demonstrates that the method is one that has been consistently utilized in the past. Respondent's second argument is that, even assuming the truth of petitioners' evidence in its entirety, such evidence is not sufficient to sustain their burden of proof. Specifically, he contends that petitioners have not shown that someone had access to the stolen item and that the loss could not be attributable to a cause other than theft. Petitioners' burden of proof has been stated by this Court in Jane U. Elliott, 40 T.C. 304, at 311 (1963), citing Mary Frances Allen, 16 T.C. 163 (1951), and quoting from Warner L. Jones, 24 T.C. 525 (1955), as follows: Petitioner has the burden of proof. This includes presentation of proof which, absent positive proof, reasonably leads us to conclude that the article was stolen. If the reasonable inferences from the evidence point to theft, the proponent is entitled to prevail. If the contrary be true and reasonable inferences point 558 to another conclusion, the proponent must fail. If the evidence is in equipoise preponderating neither to the one nor the other *191 conclusion, petitioner has not carried her burden. It is our opinion, and we hold, that the reasonable inference from the evidence adduced points to theft by a person or persons unknown. The cash was located on the front seat of the automobile when Marion arrived at the station. The left-hand door of the automobile had a faulty locking mechanism. Approximately one-half hour later, when Marion returned to the automobile, the money was gone. A search of the automobile and the surrounding area, as well as the questioning of the children who were seen in the area, failed to reveal the money. Marion immediately reported the theft to the local authorities. Under these circumstances we hold that petitioners have met their burden of proof. The case at bar is factually distinguishable from such cases as Mary Frances Allen, supra, and Waddell F. Smith, 10 T.C. 701 (1948). In each of those cases the record did not permit a finding that theft was a more reasonable inference than some other cause. From the record in the Allen case it was as reasonable an inference that the broach had merely become unclasped and had been lost. In the Smith case again one could just *192 as reasonably infer that the missing dog had merely wandered away. In the case at bar, however, the facts adduced have effectively negated the existence of this type of inference. We therefore conclude that petitioners are entitled to a deduction for a theft loss in the amount of $19,000. Decision will be entered under Rule 50. Footnotes
1. A second adjustment made in the notice of deficiency was not raised by petitioners in their petition.↩
2. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * * (3) losses of property not connected with a trade or business, if such losses arise from * * * theft. * * * (e) Theft Losses. - For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.↩